# ADULTERATION OF FOODS.

[Cuyahoga Circuit Court, January, 1896.]

ROSE v. STATE OF OHIO.

Caldwell, Hale and Marvin, JJ.

1. "BREAKFAST COCOA" NOT A VIOLATION OF STATUTE.

Under the act of March 20, 1884, as amended April 22, 1890, to provide against the adulteration of foods, "Breakfast Cocoa," in the preparation of which the manufacturer took the cocoa bean and extracted a considerable portion of the oil therefrom, and put the product thus prepared in packages, for sale, is *not* a violation of the prohibition therein "that an article of food shall be deemed to be adulterated if any valuable or necessary constituent or ingredient has been wholly or in part abstracted from it."

2. ABSTRACTING A VALUABLE PART OF THE NATURAL FRUIT.

An article of food, which is produced by abstracting from a natural fruit, a valuable part, is not a compound or mixture.

MARVIN, J.

The case of L. C. Rose, plaintiff in error, against the state of Ohio, defendant in error, involves a construction of one of the pure food statutes of the state.

In this case Rose, the plaintiff in error, was arrested upon an affidavit charging that on or about the 12th day of March, 1895, at the county of Cuyahoga, Ohio, he unlawfully offered and exposed for sale and sold an article under the name of cocoa; that it was so offered and exposed for sale and sold as an article of human food and to be used for human food; that the article so offered and exposed for sale and sold was not pure cocoa, but was an adulteration; that certain other substances were added to or mixed with the cocoa, and that there had been extracted from the cocoa a necessary constitutent thereof, to wit: a large per cent of the fat; that the article so sold was not labeled as a mixture and compound with the name and per cent of each ingredient therein, and which entered into and formed what was so exposed and offered for sale and sold.

The prosecution was under the statute passed by the general assembly of this state on the 20th of March, 1884, as amended April 22, 1890. That statute is divided into five sections, but it is only the first three sections with which we have to deal in this case. The third section has lettered subdivisions, and such subdivisions have numbered paragraphs. Omitting from each of these sections so much as is not involved in this case, we have the statute reading as follows:

Section 1. "No person shall, within this state, manufacture for sale, offer for sale, or sell any drug or article of food which is adulterated, within the meaning of this act."

Sec. 3. "An article shall be deemed to be adulterated within the meaning of this act: * * *

"(*b*) In the case of food: (1) If any substance or substances have been mixed with it, so as to lower or depreciate it, or injuriously affect its quality, strength or purity; (2) If any inferior or cheaper substance or substances have been substituted wholly or in part for it; (3) If any valuable or necessary constituent or ingredient has been wholly or in part abstracted from it."

Rose v. State of Ohio.

There is a proviso in the statute which reads: " Provided, that the provisions of this act shall not apply to mixtures or compounds recognized as ordinary articles of food, or ingredients of articles, if each and every package sold or offered for sale be distinctly labeled as mixtures or compounds, with the name and per cent of each ingredient therein, and are not injurious to health."

The plaintiff in error, Rose, was tried before a justice of the peace and a jury upon the charge made in the affidavit, and upon such trial was found guilty. He filed a motion for a new trial, also a motion in arrest of judgment, both of which were overruled, and judgment entered upon the verdict. A petition in error with a bill of exceptions embodying all the evidence was filed in the court of common pleas, and upon hearing there had, the judgment of the justice was affirmed, and the case comes to this court upon a petition in error to reverse the judgments of the lower courts, and the entire record, including all the evidence, is before us.

The important question here to be determined is whether the verdict of the jury was sustained by the evidence. It is clearly established by the evidence that at the time and place charged in the affidavit the plaintiff in error sold, to be consumed as human food, a package containing a manufactured product of the cocoa bean, the bean being a natural product of the tree known as the cacao tree. The product of the cocoa tree is the cocoa nut, and the product of the cacao tree is the cocoa bean. That such manufactured product contained nothing which was not a part of the cocoa bean. The charge in the affidavit, it will be observed, is that other substances were added to the cocoa to make the article sold, but the evidence of the experts introduced on the part of the state—shows that there was nothing added to the cocoa to make the article which was sold by Rose. That such manufactured product contained nothing which was not a part of the cocoa bean, but resulted from converting that bean, by removing the hulls and drying and baking, into what is known as cocoa nibs, and then abstracting therefrom a considerable part of the fat or oily matter, and then grinding the remainder into a powdered substance. There is no dispute in the evidence that this was the article sold under the name of cocoa; that such powdered substance is sold and has been known and has been sold for twenty-five years past and more under the name of "cocoa;" and that besides this article produced in the way which I have explained, there is sold and known and for a like period there has been sold and known as "cocoa" a manufactured product, which is produced by the mixing and compounding with the cocoa bean after grinding, some other harmless matter, so that the percentage of oil will be less than in the natural product, in either way; that is to say, whether manufactured as the cocoa which was sold in this case was manufactured, by abstracting the fat or the oily part of the bean, or by adding some harmless matter to the bean, to the natural product, so that the per cent of oil shall be reduced. For more than twenty-five years the evidence clearly shows that each of these has been known and generally recognized and sold as "cocoa."

There is no claim in this case that what was sold was not entirely wholesome. That is agreed upon by all the witnesses in this case who say anything upon that subject.

The evidence establishes that the package sold was put up in a tin box having imprinted in the cover in large letters the words " Walter

Baker & Co.'s Breakfast Cocoa," and having a wrapper around the box on one side of which printed in large letters are the words " Breakfast Cocoa," and on another side " Baker's Breakfast Cocoa " in large letters, followed by the words in smaller letters, but still in very distinct type, " From which the excess of oil has been removed," and on a third side the words in large letters " This Extract of Cocoa " and toward the bottom of the label on the same side of the box as the words last quoted these words in distinct type, " The excess of oil having been removed."

The sale was made to one Henry C. Lowrie, who asked for cocoa.

The determination of the case depends upon the construction to be given to the statute under which Rose was prosecuted. It will be observed that but for the exception already read, " Provided that the provision of this act shall not apply to mixtures or compounds recognized as ordinary articles of food, or ingredients of articles, if each and every package sold or offered for sale be distinctly labeled as mixtures or compounds, and are not injurious to health, with the name and per cent of each ingredient therein," the statute would absolutely prohibit both the manufacture and sale of all articles of food named in the statute; and it will be further observed that to bring an article within the exception—that is, to make it such an article as may be sold if properly labeled in pursuance of the statute—it must be a *mixture* or *compound* which may be relieved from the prohibition of the statute by having the proper label. And this brings us to a consideration of whether the article sold by this plaintiff in error is a *mixture* or *compound* within the meaning of the statute; for if it is neither the one nor the other its sale is absolutely prohibited by the statute, unless we come to the conclusion that it is not included among the prohibited articles enumerated in the statute. The sale and manufacture of articles named in the statute is absolutely prohibited in Ohio unless the thing to be sold is a mixture or compound, and is labeled as the statute requires. The noun " mixture " is defined in Webster's Dictionary as " That which is mixed or mingled; a mass or compound consisting of different ingredients blended together." The Century Dictionary defines the same noun as " That which results from mixing, a mixed mass, body or assembly; a compound or combination of different ingredients, parts or principles." The noun " compound " is defined by Webster's Dictionary as " That which is compounded or formed by the union or mixture of elements, ingredients or parts." And the same word " compound " is defined in the Century Dictionary as " Composed of two or more elements, parts or ingredients, not simple."

A fair interpretation of these definitions would not seem to include within any one of them any natural product, though, considered chemically, that natural product may have various ingredients; if we are to say that every article is a mixture or compound which has, chemically considered, more than one ingredient, then we would make every fruit of the earth a compound. Certainly we should make the cocoa bean a mixture or compound. But clearly, a fair interpretation of the meaning of the words " mixture " and "compound" in the statute, is something resulting from the putting together of parts or ingredients other than as nature has put them together in the fruits of the earth. And if this interpretation be correct, then to say that the article sold by Rose is a mixture or compound, we should be driven to say that the taking of an

ingredient from that which is not a mixture or compound, leaves a mixture or a compound remaining. It would seem a very strange thing if that from which we take something is not a mixture or a compound, that when we take something from that article, what remains is a mixture or a compound.

If what has been already said is correct, then the statute absolutely prohibits the sale of cocoa in the condition in which this was when sold by Rose, or this does not come within the articles enumerated in the statute.

The statute was clearly enacted for the purpose of relieving the public from being imposed upon by the sale of unwholesome articles of food, and from being imposed upon by the sale of such articles which, though not unwholesome, are less nutritious, palatable, or valuable than would be indicated by the names under which they are sold.

Now, reading this statute, just that part of this statute which applies to this case, we have, "No person shall, within this state, manufacture for sale, offer for sale, or sell, any article of food if any valuable or necessary constitutent or ingredient has been wholly or in part abstracted from it." Now, in subdivision (b) of sec. 3, if we substitute for the word "it," what it clearly stands for, we have "If any valuable or necessary constitutent or ingredient has been wholly or in part abstracted from such article of food." And this brings us to a consideration of what is meant by the words "article of food." We all know there are many articles of food which have been so long known as such, and by some particular name, that, though not consisting of a single natural product, and though not made up of all the ingredients or elements of any natural product. are still so recognized as articles of food that they cannot be misunderstood by intelligent people. The most familiar of these, perhaps, is bread. Another almost equally familiar in modern times, is cheese. We all know that one cheese differeth from another cheese in its nutrition and palatability; and yet it is doubtful, indeed it would seem to be more than doubtful whether, if there were no other statute on the subject, the sale of cheese made from milk from which some part of the cream had been removed would be prohibited by this statute. The legislature has wisely enacted another statute to protect the public from having poor cheese imposed upon them when they suppose they are buying good cheese. But if the construction of the statute contended for on the part of the state in this case is the true construction, then there was no occasion at all to enact a statute, other than this, to protect the public from having skim milk cheese imposed upon them.

I suppose nobody would think of prosecuting under this statute for the sale of skim milk cheese. We have a statute which authorizes prosecution for that certainly.

Sugar is one of the commonest and best known articles of food, and is used extensively in every household. It is a manufactured product, it is a manufactured article of food, and it does not contain all the elements and ingredients of the natural product of the earth, the sugar cane. Ordinarily, if one orders from his grocer sugar, certainly if he orders coffee sugar, he will get an article of food which is white in color, and from which a valuable, nutritious and palatable ingredient has been removed, or rather he will get an article of food to produce which a valuable ingredient has been removed, from a natural product of the earth. In the process of refining sugar, to make it white, there is taken

out a considerable part of its sweetness, and yet no one will claim that there does not remain a well known, a well recognized article of food, from which article of food no valuable or necessary ingredient has been removed, or to use the language of the statute, "abstracted." That which was abstracted was taken from the natural product and not from the article of food known as coffee sugar.

Flour is a well known article of food, but we all know that to produce flour of the finest quality, there has been abstracted from the wheat, which is the product of nature, a nutritious and valuable part.

The verb "abstract" is defined in the Century Dictionary as "to draw away, take away, withdraw, or remove." With that definition the removing of cream from milk would be the abstracting, from the natural product, of a valuable part of such milk. We have a statute which was passed two years after the enactment of the one under consideration, which makes it an offense to sell milk from which the cream or a part thereof. has been removed, unless by having a certain label upon the outside of each vessel, in a conspicuous place, with the words "skimmed milk." But if the contention on the part of the state as to the construction of this statute is the true one, it would seem that the statute passed in '86 as to the sale of milk from which cream had been removed, was wholly unnecessary.

To adopt the more modern method of allowing the cream to rise to the top of the milk and then by a faucet allowing the milk to drain away, would not leave the natural product with all its constituent parts, but we should have removed from it a valuable part, and yet, we should have the cream left, which is a well known article of food, the sale of which under its proper name would not be claimed to be prohibited by the statute under consideration.

If the word cocoa is the proper name, recognized by the public, and by those engaged in the purchase and sale of articles of food, of the article sold by Rose, and if that is the name by which such article was known for many years prior to the enactment of the statute under consideration, then, it would seem to follow that it was this manufactured product from which nothing should be abstracted, rather than the cocoa bean being that from which nothing may be abstracted, and still leave a saleable product.

The evidence clearly shows that the cocoa bean, in its natural state, is not sold in this country as an article of food to be consumed without manufacture, and it is further shown that the manufactured product of the cocoa bean, as sold for domestic use, and from which nothing has been removed, and to which nothing has been added, is known and recognized by dealers and the public as chocolate, and not as cocoa.

The evidence establishes, as testified to by all the experts in the case, that without the removal of a considerable part of this fat or oil the product would not remain in a powdered state—as what is sold as cocoa is always found to be—at a temperature of above 70° or thereabouts, but would by the action of the heat alone, become an oily, greasy paste.

Attention has already been called to the fact that the sale of cocoa in the condition in which this was, which was sold by Rose, would be absolutely prohibited if it is among the articles of food named in the statute; and this has been done because it was urged here that a proper labeling might relieve it from that prohibition; and it was urged that such an article ought to be labeled as well as one which is produced by a compound or mixture made up of the natural cocoa bean with all its in-

gredients to which is added some other harmless substance ; but, however, true that may be—and we are not disposed to say that it ought not to be labeled—that is a question for the legislature and not for the court—the legislature has not made any provision for relieving this—if it is among those contained in the statute, or among those so named, no provision has been made by the legislature to relieve it from that prohibition, by any label, and we find this curious state of things, if we hold with the state, that the manufacturer who adulterates his cocoa by mixing some harmless matter with the ground bean, may sell his *compound* by putting the liabel, provided for by the statute, upon each package, while he who simply extracts a part of the oil from the bean, cannot tell his at all, with or without a label. We cannot think this was the intention of the legislature.

The decisions of the courts under the pure food laws of this state and the other states of the Union, as well as the decisions under similar statutes in England, fully sustain the claim made by the state that a liberal construction should be given to such statutes for the purpose of remedying the evils against which such statutes are directed. As was well said by Judge UPSON, in the case of *Palmer* v. *State of Ohio*, 39 Ohio St., page 236: "Those who buy food have a right to know what they buy, and to have the means of judging for themselves as to its quality and value." And the purpose of the several statutes of this state, known as the pure food laws, have as their object the accomplishment of this result, and yet, we find nothing in any of the authorities which go so far as to justify the prohibition under any such statute as this under consideration, of an entirely wholesome manufactured article of food which is neither a compound nor a mixture where no deception is practiced.

We are cited to a case found in the 30th volume, new series, of the Law Times Reports, at page 633. The title of the case is *Roberts, appellant,* v. *Egerton, respondent,* decided by the Queen's bench in 1874. From this decision one of the justices dissented. The case grew out of the sale by Roberts in 1873 of two ounces of green tea. The tea was sold in the same state in which it came from China. It had there been painted or faced with gypsum and Prussian blue for the purpose of coloring it, and thus colored it was known in the market as green tea. It was also shown in the case that there is a pure green tea imported from Japan, which is not generally known by that name. Three justices, sitting in this case, delivered opinions sustaining a conviction.

The chief justice, Cockburn, used this language: "I am of the opinion that this conviction was right, although the view taken of the matter by my brother Quain has made me hesitate. The statute provides so far as is material to this case, that every person who shall sell as unadulterated any article of food or drink or any drug which is adulterated, shall, for every such offense, be summarily convicted. The appellant has been convicted for this offense in respect of the sale of some green tea, and two questions for our consideration arise from the case stated by the convicting justices. First, is this an adulterated article? I think it is. The case finds that a a kind of green tea, which is not painted nor plastered, comes from Japan and resembles in color and appearance what is popularly known as 'green tea.'" Green tea, therefore, may be had unadulterated, and this process of painting or facing, as it seems to me, amounts to adulteration. It is also found in the case that the practice of painting and facing tea sold as green tea is not known to the public who are the consumers, and further

that this tea was warranted as genuine. I conclude from the case that this article was adulterated.''

Another of the justices who rendered an opinion sustaining the conviction was Justice Archibald, and it is what he said to which our attention has been especially called by counsel in this case, on the part of the state.

" I agree with my Lord and my brother Blackburn that this is a case within the application of this act. It may be that green tea may come in time to mean pure tea with a facing of foreign materials. According to the case that is now in the opinion of the tea trade, and if it were material it must be taken that the appellant who is in the trade is aware of the process by which Chinese tea is colored. The question, however, is what the public who are the purchasers and consumers, understand by the expression ' green tea' when they ask to buy it. The case finds that the public know nothing about the coloring gypsum or Prussian blue. Except for its being an article of commerce known in the trade as 'green tea,' this mixture would undoubtedly mean adulteration, and the fact of the public ignorance makes it so in this case, notwithstanding the received use of the term amongst persons who know what it means.''

The ground of this opinion clearly is, that the public having no knowledge that what they buy is different from the natural product, the fact that it is known by the trade not to be in its natural state does not relieve it from being an adulteration.

But in the case before us, it is not only shown that the trade know that to produce the article sold as cocoa to be consumed in families, there has been abstracted from the bean a part of the oil or fat, but the public are notified of that fact by the label on the package itself. It is not meant by this that there is any labeling of this package such as the statute requires for a compound or a mixture, but only that the public are not left in ignorance in this case as to what the package contains, as the public were left in the English case from which quotations have been made in this opinion.

In the case before us it is not only shown that the trade knows that a part of the oil of the natural product has been abstracted, but the public are notified thereof by the label on the back of the package. It is said, however, that to say that the excess of oil has been removed and that this is an extract of cocoa, leaves entirely uncertain what amount of this oil has been removed, and it would leave for every manufacturer to set up for himself a standard and by such self-constituted standard determine what is the amount of the excess of oil; and this argument is not without weight and force. It must not be forgotten, however, that nature has not fixed a definite and certain standard as to the amount of oil in the cocoa bean itself.

The case shows that the amount of oil in the bean varies from thirty-six per cent to fifty-five per cent in its natural state, so that if no oil were to be removed, one might get a cocoa having as little as thirty-six per cent of oil, or he might get a cocoa containing as much as fifty-five per cent of oil. We all know that we may purchase pure coffee from which, when treated by the best cook in the world, we shall get an unpalatable and disagreeable drink; while if we obtain another kind of pure coffee treated in the same way by the same cook, we shall get a most delightful beverage.

It is not meant by this to intimate that an article may be adulterated, provided such adulteration does not reduce the article below the standard

of the poorest article of the kind which is pure, but only that the fact that this product having had the excess of oil extracted from it, and thereby leaving uncertain what per cent of the oil remains, does not make it an adulteration.

If we were to buy a cocoa, or as a cocoa, the ground cocoa bean from which nothing has been abstracted, we might get a good article, if it takes all the oil to make a good article, I mean all the oil of the best bean, or we might get and still have a pure article—an article which had very much less oil. Our ancestors, in their wisdom, had a maxim for the test of a pudding; and it is doubtful whether we can, by any amount of legislation, fix a standard that is certain to be right, without the application of the same maxim.

A majority of the court are of the opinion that the evidence does not sustain the verdict, and that the motion for a new trial should have been granted, and for this error the judgment of the court of common pleas and of the justice of the peace is reversed, and the plaintiff in error is discharged.

(Reverses *Rose* v. *State*, 1 O. L. D., 44.